1

2

3

4

5

6

7

8  IN THE UNITED STATES DISTRICT COURT

9  FOR THE EASTERN DISTRICT OF CALIFORNIA

10  DALE CRAPO,

11  Petitioner,                    No. 2: 07-cv-2554 JAM KJN P

12  vs.

13  BEN CURRY,

14  Respondent.          FINDINGS AND RECOMMENDATIONS

15  _____/

16  I. Introduction

17  Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18  habeas corpus pursuant to 28 U.S.C. § 2254.  In 1985 petitioner was convicted of second degree

19  murder.  Petitioner is serving a sentence of 15 years to life.

20  In the instant action, petitioner challenges the 2006 decision by the California

21  Board of Parole Hearings ("BPH") finding him unsuitable for parole.  This was petitioner's

22  seventh suitability hearing.  This action is proceeding on the original petition filed November 29,

23  2007.  Petitioner alleges that there was insufficient evidence supporting the decision by the BPH

24  finding him unsuitable for parole.

25  After carefully considering the record, the undersigned recommends that the

26  petition be granted.

1

II.  Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254. Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 405.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law; or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law. . . .  [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

2

inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority, in arriving at their decision.  Early v. Packer, 537 U.S. 3 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

III.  Analysis

Petitioner alleges that there was insufficient evidence to support the BPH's 2006 decision finding him unsuitable for parole.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that "deprive[s] a person of life, liberty or property without

due process of law." U .S. Const. amend. XIV, § 2.  A person alleging a due process violation must demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. Kentucky Dep't. of Corrs. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).  A protected liberty interest may arise from either the Due Process Clause itself or from state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987). In the context of parole, the United States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, when a state's statutory parole scheme uses mandatory language, it "'creates a presumption that parole release will be granted' when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest." McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Neb. Penal, 442 U.S. 1, 12 (1979)).

Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417 (2005).  Generally, one year prior to an inmate's minimum eligible parole release date, the Board will set a parole release date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public."  In re Lawrence, 44 Cal.4th 1181, 1202, 82 Cal.Rptr.3d 169 (2008) (citing Cal.Penal Code § 3041(a)).  A release date will not be set, however, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration. . . ."  Cal. Penal Code § 3041(b).

California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a

4

1   parole release date.  Allen, 482 U.S. at 377-78 (quoting Greenholtz, 442 U.S. at 12); Irons v.

2   Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v. Cal. Bd. of Prison Terms, 461 F.3d

3   1123, 1128 (9th Cir. 2006)); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion,

4   306 F.3d at 903.

5          In the context of parole proceedings, it is well established that inmates are not

6   guaranteed the "full panoply of rights" afforded to criminal defendants under the Due Process

7   Clause.  See Pedro v. Or. Parole Bd., 825 F.2d 1396, 1398-99 (9th Cir. 1987).   Nonetheless,

8   inmates are afforded limited procedural protections.  The Supreme Court has held that a parole

9   board's procedures are constitutionally adequate so long as the inmate is given an opportunity to

10  be heard and a decision informing him of the reasons he did not qualify for parole.  Hayward v.

11  Marshall, 603 F.3d 546, 560 (9th Cir. 2010) (quoting Greenholtz, 442 U.S. at 16).  As a matter of

12  state constitutional law, denial of parole to California inmates must be supported by "some

13  evidence" demonstrating future dangerousness.  Hayward, 603 F.3d at 562 (citing In re

14  Rosencrantz, 29 Cal.4th 616, 128, 128 Cal.Rptr.2d 104 (2002)); see also In re Lawrence, 44

15  Cal.4th at 1191 (recognizing  the denial of parole must be supported by "some evidence" that an

16  inmate "poses a current risk to public safety"); In re Shaputis, 44 Cal.4th 1241, 1254, 82

17  Cal.Rptr.3d 213 (2008) (same).  "California's 'some evidence' requirement is a component of the

18  liberty interest created by the parole system of [the] state,"  Cooke v. Solis, 606 F.3d 1206, 1213

19  (9th Cir. 2010), and compliance with this evidentiary standard is, therefore, mandated by the

20  federal Due Process Clause.  Pearson v. Muntz, 606 F.3d 606, 611 (9th Cir. 2010).  Thus, a

21  federal court undertaking review of a "California judicial decision approving the . . . decision

22  rejecting parole" must determine whether the state court's decision "was an 'unreasonable

23  application' of the California 'some evidence' requirement, or was 'based on an unreasonable

24  determination of the facts in light of the evidence.'"  Hayward, 603 F.3d at 562-63 (quoting 28

25  U.S.C. § 2254(d)(2)).

26  ////

When assessing whether a state parole board's suitability decision was supported by "some evidence," the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." Irons, 505 F.3d at 851.  The court must look to California law to determine what findings are necessary to deem a petitioner unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by "some evidence" or whether it constituted an unreasonable application of the "some evidence" principle.  Id.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers.  The regulation is designed to guide the Board's assessment regarding whether the inmate poses an "unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole.  In re Lawrence, 44 Cal.4th at 1202.  The Board is directed to consider all relevant, reliable information available, including the circumstances of the prisoner's:  social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  15 Cal.Code Regs. § 2402(b).

The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole.  15 Cal. Code Regs. § 2402(c)-(d).  Factors tending to show unsuitability include:

> (1) The Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
>
> > (A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled, or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

(15 Cal. Code Regs. § 2402(c).)

Factors tending to show suitability include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has guilt of a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the

1    crime, the prisoner suffered from Battered Woman Syndrome, as defined
     in section 2000(b), and it appears the criminal behavior was the result of
2    that victimization.

3    (6) Lack of Criminal History.  The prisoner lacks any significant history of
     violent crime.
4
     (7) Age.  The prisoner's present age reduces the probability of
5    recidivism.

6    (8) Understanding and Plans for Future.  The prisoner has made realistic
     plans for release or has developed marketable skills that can be put to use
7    upon release.

8    (9) Institutional Behavior.  Institutional activities indicate an enhanced
     ability to function within the law upon release.
9

10   (15 Cal. Code Regs. § 2402(d).)

11          The overriding concern is public safety, In re Dannenberg, 34 Cal.4th at 1086, and

12   the focus is on the inmate's current dangerousness.  In re Lawrence, 44 Cal.4th at 1205.  Thus,

13   under California law, the standard of review is not whether some evidence supports the reasons

14   cited for denying parole, but whether some evidence indicates that a parolee's release would

15   unreasonably endanger public safety.  In re Shaputis, 44 Cal.4th at 1241.  Therefore, "the

16   circumstances of the commitment offense (or any of the other factors related to unsuitability)

17   establish unsuitability if, and only if, those circumstances are probative to the determination that

18   a prisoner remains a danger to the public."  In re Lawrence, 44 Cal.4th at 1212.  In other words,

19   there must be some rational nexus between the facts relied upon and the ultimate conclusion that

20   the prisoner continues to be a threat to public safety.  Id. at 1227.

21          The BPH found petitioner unsuitable for parole for the following reasons.  The

22   BPH found petitioner unsuitable based on two factors related to the commitment offense.  First,

23   the BPH found that the offense was carried out in a dispassionate and calculated manner.  (Dkt.

24   No. 4, at 57 of 216.)  Second, the BPH found that the motive for the offense was trivial.  (Id.)

25   The BPH also found petitioner unsuitable based on his criminal history.  (Id., at 58.)

26   Additionally, the BPH found that petitioner required additional therapy in order to learn to cope

8

with stress in a non-destructive manner and in order to gain further insight into his crime. (Id., at 59.)

In order to put these findings in context, the undersigned will first summarize the facts of the commitment offense. While the transcript from the 2006 hearing contains a factual summary, the opinion from petitioner's 1992 suitability hearing contains a more detailed factual summary set forth herein:

> The facts surrounding Charles Price's death begin with a group of six people living in the town of Sonora. The group consisted of the prisoner, Claudia Connolly, Donas Sanders, Jamie Lutrick, Charles Price and Ralph Kellogg. These people all became acquainted sometime in the winter of 1983 to 1984 in the town of Sonora. They all socialized with one another on numerous occasions; however, several witnesses testified that the victim was disliked by the other members of the group. This animosity stemmed primarily from the victim's treatment of Jamie Lutrick. Lutrick and the victim had had a turbulent relationship as boyfriend and girlfriend for approximately seven years. The victim was known to be both verbally and physically abusive to Lutrick. The victim would live with Lutrick for a short time,, e [sic] they would fight, he would move out, and they would resume their relationship a short time later. Claudia Connolly testified the prisoner and the victim argued a lot over the victim's treatment of Lutrick. In fact, the two men were known to threaten each other's lives on a frequent basis. On one occasion when the group was at Connolly's apartment in Sonora, which she shared with her boyfriend Sanders, the prisoner and the victim got into a physical altercation. They had argued over Lutrick, and the victim came at the prisoner with a small hatchet. The prisoner disarmed him and proceeded to beat on the victim, giving him a black eye and a chipped tooth before Sanders could break up the fight.
>
> Further animosity arose between the prisoner and the victim when the prisoner struck up a more serious relationship with Lutrick. One evening, Connolly and Sanders had the prisoner, the victim, Lutrick and Lutrick's daughter Ava to dinner. The victim became intoxicated and passed out on her sofa. The prisoner thereafter took Lutrick back to his apartment and slept with her. When the victim woke up, he was extremely upset and went to the prisoner's apartment to find Lutrick. The prisoner told the victim that Lutrick was not there, and the victim left. He was still very upset over the incident when he returned to Connolly's apartment.
>
> Approximately three weeks prior to the victim's murder, the prisoner told Connolly that he was going to take care of Chuck (Price) down at the river, that he knew of a place to put the body

9

where no one would find him, and that no one would look for the victim because no one liked him.  Lutrick testified to a similar conversation around this time between her, the prisoner and Ralph Kellogg.  The prisoner said he was going to Italian Bar Road to bury the victim.  Lutrick testified she cried and convinced the prisoner not to do it. The prisoner' anger at this point was prompted because he believed the victim had stolen his bike and had given Lutrick a communicable disease, which she passed to the prisoner.

From approximately March to May, 1984, Connolly and Sanders had lived on the Stanislaus River at a campground to conserve their money.  In the week before Memorial Day, they moved in with Lutrick at her apartment in Sonora.  The prisoner had been sleeping with Lutrick; however, a few days before May 27, Lutrick broke off her relationship with the prisoner because she had decided to patch up her relationship with the victim once again.  The prisoner was quite upset.  He cried, told Lutrick he loved her, and told her he did not wish to go.

During the week before May 27, Sanders had acquired a .25 caliber handgun from a man named Kenneth Torrey. Sanders had obtained the gun to give to Connolly for her protection.  The day Sanders purchased or agreed to purchase the gun (he had not paid for the gun at this time), the prisoner bought some ammunition for it.  The ammunition was given to Connolly, and she put it in her purse.  The gun was examined by several people that day at Lutrick's apartment.  Several witnesses testified that Sanders waved the gun around and, in fact, pointed it at Lutrick and pulled the trigger.

On May 26, 1984, in the late afternoon, a party developed at Lutrick's apartment.  Initially present [were] Connolly, Sanders, Lutrick and Ava.  The victim, Kellogg and a man named Jim or Steve eventually showed up at the party.  Later in the evening, a fight erupted between the victim and Kellogg because the victim once again was abusing Lutrick.  A few punches were thrown, and Sanders broke up the fight.  The victim then left the apartment, and Sanders told Kellogg he had had enough of standing up for the victim and from then on the victim was on his own.  Approximately one hour later, the prisoner arrived at the party.  Connolly testified that she had had possession of the gun that Sanders had bought her the entire day and evening.  After the prisoner arrived, though, Sanders asked Connolly for the gun so that he could give it to the prisoner to take out of the apartment.  The purported reason was that everyone except the prisoner was extremely drunk, and he wanted the prisoner to hide the gun under the dashboard of his and Connolly's car.  There was other conflicting testimony about how exactly the gun was taken out of the apartment and who had possession of the gun that evening, but nevertheless the gun apparently was taken to the car by either the prisoner or Sanders.

After the prisoner arrived, a second fight broke out between the victim and Kellogg.  This time, Kellogg inflicted serious injuries upon the victim before the prisoner could break up the fight.  The prisoner thereafter took the victim to the hospital in Connolly's car.  Ralph Kellogg testified that when the prisoner returned to the apartment in the early morning hours of May 27, Kellogg, the prisoner and Sanders had a conversation about killing the victim.  Specifically, Kellogg testified the prisoner said the victim had to go because he had made threats to Kellogg and because the prisoner was mad at the victim for other reasons.  Sanders replied that it sounded like a good idea to him. The prisoner then asked Kellogg if he knew of a place to take the victim's body so it would not be found.  Kellogg replied he knew of several mine shafts where a body could be dumped.  After this conversation, Sanders brought the handgun into the apartment and gave it to the prisoner.  Sanders then got the ammunition from Connolly's purse, and he and the prisoner loaded the gun.  The prisoner took possession of the gun and placed it in his waistband.  The prisoner thereafter said, "he had been mad at (Price) because of a case of crabs and his bicycle being stolen and Jamie and a few other things [and] ... he was glad the guy was going to be out of the way."  Sanders said he was in agreement.

After this conversation, the prisoner, Sanders and Kellogg left the apartment to return some boots to a friend of Sanders.  Apparently, the victim had been using these boots.  On the way back to the apartment , they saw the victim walking toward Lutrick's apartment.  The victim had a large bandage about his head, his eye was bruised, and he looked in general to be "a mess."  Kellogg, who was driving, stopped and he and the victim got into an argument.

They then drove back to Lutrick's apartment leaving the victim walking on the side of the street.  The victim then arrived at the apartment.  Connolly testified that [at] this point, she was awake in the apartment, after having slept there after the party.  She testified that the victim asked Sanders to drive him to Clifford Ball's house trailer on Italian Bar Road to pick up some clothing.  Sanders agreed.  The prisoner, Sanders and the victim left the apartment together.

Clifford Ball lives in a house trailer located on Italian Bar Road, a few miles north of the Town of Columbia.  Ball testified that on May 27, early in the morning, a car drove up to his trailer.  Ball recognized Sanders and the victim in the car.  He had met these men before when Sanders and Connolly had lived in their campground on the Stanislaus River near Ball's trailer.  Ball identified the prisoner as the driver of the vehicle.  Ball further testified the victim was wearing dark glasses and had blood on his hands.  He did not remember a bandage about his head.  When the victim took the glasses off, Ball noticed he had a black eye and

11

stitches above the right eye.  The victim then went in the trailer and gathered his clothes.  Back at the car, Ball noticed there was a 12-pack of Black Label beer on the floorboard, and Sanders gave him a can of beer.  The victim then got back into the car, and the three men drove away, heading north on Italian Bar Road toward the old campground at the river.  Ball never saw the vehicle come back and did not hear anything unusual that day.

After the prisoner, Sanders and the victim left Lutrick's apartment that morning, Kellogg, Lutrick and Connolly went to the Horseshoe Bar located in Sonora to consume more alcohol.  Forty-five minutes to an hour later, the prisoner and Sanders came into the bar, but the victim was not with them.  Sanders came in first and appeared to be upset.  When the prisoner arrived at the bar, he appeared to be fine but he was chain smoking, which Connolly testified was unusual because he was not known to be a smoker.

Kellogg testified he asked the prisoner if he had to worry about the victim, and the prisoner replied he did not have to worry.  Kellogg also asked Sanders exactly where the victim was, and Sanders replied they had gotten into an argument and had dropped the victim off in Columbia.  Lutrick testified that she overhead the prisoner tell Kellogg that the victim had argued with Sanders, and when they pulled up to a stop sign in Columbia, the victim jumped out of the car and ran away.  She further testified Sanders told her the same thing.

The following day, Ava and a neighbor, Lana Knowles, found a gun in a trash bin located outside of Lutrick's apartment.  The gun was identified as the gun Sanders bought for Connolly.  It was turned over to the police. The bullet taken from the body and casing found at the scene of the crime at the river were determined to have come from this gun.

Lutrick further testified that on Tuesday the prisoner came to her apartment.  He asked her to move into an apartment "out in the boondocks" with him for two months and to not tell anyone where she was going.  She refused.  Early the next morning, Kellogg and the prisoner were at the Horseshoe Bar drinking beer.  Kellogg began to ask the prisoner again about the victim, but the prisoner told him, "Don't talk about it in public."  They went back to the prisoner's apartment then, and the prisoner told Kellogg that the victim had probably put the gun in the trash bin to stir up trouble before he left town.  The prisoner further told Kellogg that he had last seen the victim when the victim got mad and left the car in Columbia.

After the combined preliminary hearing of the prisoner and Sanders, Lutrick visited the prisoner in jail.  The prisoner held up a piece of paper to the dividing glass window with a message on it for her.  The paper stated he was innocent, she should tell the

whole truth, and Sanders accidentally shot the victim while Sanders was doing one of his stunts.  There had been testimony at the trial regarding certain stunts that Sanders had pulled.  For example, Connolly had testified that Sanders was very good with knives, and he could throw a knife and cut a cigarette out of her mouth.  Also Kellogg had testified that on one occasion, Sanders pretended to be a burglar and waved the handgun through a window at Lutrick's apartment when a party was in progress.

The prisoner did not testify on his own behalf. The defense was that the prosecution had failed to meet its burden of proving the prisoner's guilt beyond a reasonable doubt because there was a lack of evidence connecting the prisoner to the crime and because the prosecution's witnesses were not credible.

(Dkt. No. 4, at 113-21.)

The transcript from the 2006 suitability hearing includes additional information regarding the offense.  In particular, it states that after the arrest of petitioner and Sanders on May 30, 1994, Sanders testified that after he, petitioner and Price left the Ball residence, Price suggested that they smoke a joint.  (Dkt. No. 4, at 15.)  They all got out of the car.  (Id.)  Price started down the embankment and petitioner followed from behind.  (Id.)  Sanders heard a gunshot, and petitioner returned saying that he had shot Price in the neck or head.  (Id., at 15-16.)

Petitioner's criminal history included no juvenile record.  (Dkt. No. 4, at 11.)  In 1978, petitioner was arrested for shoplifting.  (Id., at 12-13.)  In 1984, petitioner was arrested for driving under the influence of alcohol.  (Id., at 12.)

The undersigned now considers whether the circumstances of the commitment offense as well as petitioner's prior criminal record were some evidence of his current dangerousness.  Petitioner's criminal history was neither violent nor "significant."  See 15 Cal. Code Regs. § 2402(c)(2), (d)(6).  The offenses petitioner was convicted of before his commitment offense were relatively minor.  For these reasons, the undersigned finds that petitioner's criminal history was not some evidence of his current dangerousness.

At the outset, the undersigned finds that the BPH's finding that the offense was carried out in a dispassionate and calculated manner was proper.  Petitioner drove the victim to

13

1  an apparently secluded area and shot him.  The BPH's finding that the motive for the offense was

2  trivial is also well supported:

> The motive of the crime is inexplicable and very trivial in
> relationship to the offense.  The inmate's version indicates that Mr.
> Sanders – it was his belief Mr. Sanders accidentally killed the
> victim.  However, Mr. Sanders testified to a totally different
> scenario.  His scenario was that the inmate was very upset at the
> victim because the victim had abused his girlfriend.  The inmate
> was involved with the girlfriend, who ultimately gave him a
> venereal disease or some type of sexually contracted problem, and
> basically was upset at the victim.  He is the one who then later on,
> based upon Mr. Sanders' testimony, shot the victim in the throat or
> the neck area.  The motive of the crime is jealousy.  There seems to
> be an indication that the victim's girlfriend, even though she spent
> time with the inmate, decided to return back to the victim.  This
> happened just briefly before the offense occurred, and it's
> understandable why the jury did, in fact, come up, or why the
> inmate was in fact convicted of this offense.  And as the inmate
> knows we are unable to overturn a verdict by a jury.

12  (Dkt. No. 4, at 57-58.)

13      The undersigned must consider whether the unchanging factors of the

14  commitment offense were some evidence of petitioner's current dangerousness.

15      As the California Supreme Court has recognized,

> Absent some affirmative evidence of a change in the prisoner's
> demeanor and mental state, the circumstances of the commitment
> offense may continue to be probative of the prisoner's
> dangerousness for some time in the future. *At some point*, however,
> when there is affirmative evidence, based upon the prisoner's
> subsequent behavior and current mental state, that the prisoner, if
> released, would not currently be dangerous, his or her past offense
> may no longer realistically constitute a reliable or accurate
> indicator of the prisoner's current dangerousness.

21  <u>Lawrence</u>, 44 Cal.4th at 1219, 82 Cal.Rptr.3d 169 (emphasis added).

22      The only post-commitment factor the BPH relied on in finding petitioner

23  unsuitable was his need for therapy:

> The prisoner needs therapy, self-help and programming in order to
> face, discuss, understand and cope with stress in a non-destructive
> manner, as well as to get further insight into the crime.  Until
> progress is made, the prisoner remains to be unpredictable and a
> threat to others.

(Dkt. No. 4, at 59.)

The undersigned first considers whether the record demonstrated that petitioner required "stress therapy."  The 2004 psychological report relied on by the BPH did not find that petitioner required additional therapy in order to learn how to deal with stress.  In relevant part, the report stated that petitioner showed "no signs or symptoms of a mental disorder.  His judgment was within normal limits and he appears to be of above average intelligence."  (Dkt. No. 4, at 100.)  Regarding the assessment of dangerous, the report stated,

> As has been noted by this evaluator in the past, it is impossible to predict danger to the community for any particular individual with any dependability or validity.  He has no history of violence beyond defending himself from the attack of another inmate seven years ago within the institution.  This infraction in 1993 was adjudicated as a mutual combat without serious injury.  Mr. Crapo has also been free of alcohol abuse since his incarceration despite the fact that alcohol may be obtained within this setting.  He is aware that continued abstinence from alcohol and drugs would be needed to maintain his level of maturity and judgment within the community.

(Dkt. No. 4, at 100.)

The "recommendations" section of the report stated,

> As noted above, Mr. Crapo should participate in ongoing support groups for the support of sobriety and abstinence from use of alcohol and drugs.  His use of prosocial performance as noted in his last full Board Report is impressive.  He has used his EMT training in applying the Heimlich maneuver to a choking inmate in 1989.  He has had numerous laudatory chronos.  He continued his involvement in the Arts in Corrections Program while it was viable.  He has also exhibited professional creativity in the design of new tools and has applied for patents for these tools.  He has been a consistent and highly lauded worker in Prison Industries in the Woodshop.

> He has a published article in Woodwork magazine.  He also has a recent commendation for his emergency response to a fellow worker's head/eye injury at the work site.

> He reports, and it seems apparent by information in previous reports that he has a supportive family who would provide him with support whenever possible were he to be released to the community.

1
2
3
4
5
6

> It is important to note that once again predictions regarding an <u>individual's</u> danger to the community if released on parole are impossible to make in any reliable or valid way. The tools are not available at this time to assess an <u>individual's</u> capability. We would need to know the total community surroundings and situation in which the inmate found himself at release and we have no way of knowing the factors that could make even an unreliable guess of dangerousness possible. We have only his history in the controlled setting to suggest that he has the skills to avoid violent behavior or involvement in violent behavior, where ever he resides.

7   (Dkt. No. 4, at 101.)

8   Although the psychologist who prepared the 2004 stated that she could not make

9   predictions regarding any individual's danger to the community, the report was otherwise

10  positive.[1]

11  Apparently the BPH had previously recommended that petitioner receive therapy

12  for stress as it was addressed in the psychological report prepared for petitioner's 2003 suitability

13  hearing:

14
15
16
17
18
19
20
21
22

> The Board of Prison Terms recommended that inmate Crapo participate in therapy to cope with stress in a non-destructive manner. We discussed at length how inmate Crapo deals with stress and anger. He reports good self-control techniques. He states he has "learned to diffuse stressful situations" by taking "a step back" in order to gather his thoughts and analyze his feelings. Therefore, he is able to be more calm and make a more rational decision in regard to stressful situations. This stress reduction strategy seems to work well for him in a difficult environment such as the prison system. Inmate Crapo also uses his woodworking skills to make custom design furniture in the Hobby Shop, as well as create woodwork and ceramic projects in the Arts and Corrections Program. He finds that these activities help reduce any experienced stress and give him a sense of relaxation. He expresses much pride about his work and states he "enjoys the journey" when it comes to his creative activities. Inmate Crapo also enjoys training other inmates in the Woodshop.

23

24
25
26

[1] The BPH had the 2004 psychological report prepared in order to assist it in assessing petitioner's current dangerousness. As discussed infra, other psychologists who examined petitioner for earlier suitability hearings felt competent to make an assessment of his current dangerousness if released. Why the BPH would continue to employ the psychologist who prepared the 2004 report who was unable to make this assessment is puzzling.

1  (Dkt. No. 4, at 95.)

2          The 2003 psychological report also stated that the type of therapy the BPH

3  recommended petitioner receive was unavailable:

4          The Board of Prison Terms has recommended that Crapo
           participate in therapy in order to better cope with his stress, as well
5          as gain insight into his behavior as it relates to his commitment
           offense.  Please note we cannot meet this request at the present
6          time because the Psychology Department only meets with inmates
           who have a mental illness.  There are no individual
7          counseling/therapy resources available at DVI at this time for
           General Population Lifer inmates such as inmate Crapo.  We do
8          not have the resources available to provide these services to these
           inmates.  However, the Psychology Department will be available to
9          provide treatment to inmate Crapo if indicated and appropriate (for
           example, development of a mental illness or experiencing a crisis).

10

11  (Id., at 96.)

12          The 2003 psychological report also stated that petitioner's "level of dangerousness

13  is considered low compared to the general inmate population assuming he can maintain his

14  commitment to sobriety and recovery in the community."  (Id.)

15          The psychological report for petitioner's 2000 suitability hearing also did not find

16  that petitioner required additional therapy regarding how to deal with stress.  The 2000 report

17  described petitioner's mental status/treatment needs as follows:

18          Mr. Crapo presented as an alert and oriented 39 year old white
           male.  His memory was unimpaired.  He was insightful, and fully
19          aware of his circumstances and of the purpose of this evaluation.
           His affect was of normal intensity, stable and without any clinically
20          significant presentation of mood.  He denied hallucinations or
           delusions.  No signs or symptoms of mental disorder were noted.
21          His judgment appeared to be normal.  He appeared to be of above
           average intelligence.  No behavioral abnormalities were noted.
22

23  (Dkt. No. 4, at 92.)

24          The section of the 2000 psychological report titled "Assessment of

25  Dangerousness" stated as follows:

26          Mr. Crapo has been an exceptional and productive inmate

17

1   throughout his history of incarceration.  He has no history of
    violence beyond defending himself from the attack of another
2   inmate seven years ago.  This infraction in 1993 was adjudicated as
    a "mutual combat without serious injury."  No indicators of
3   potential violence are noted at this time.

4   (Dkt. No. 4, at 93.)

5          The 2000 psychological report concluded,

6          Mr. Crapo appeared to me to be a well-adjusted inmate in a prison
           context, and has consistently attempted to make the best of his
7          circumstances.  I cannot help but be favorably impressed by
           recurrent instances of prosocial performance.  Examples would be
8          his intervention applying the Heimlich Maneuver to a choking
           inmate in 1989, his numerous laudatory chronos, his continuing
9          involvement in the Arts in Corrections program, and his continuing
           professional creativity in designing new tools for which he has
10         applied for patents.

11         It was a pleasure to conduct this evaluation of Mr. Crapo, and to
           join with those evaluators in the past who positively regard him
12         and recommend him for favorable consideration for eligibility for
           parole by the Board of Prison Terms.  I commend him for his
13         steadfastness in maintaining a solid and constructive program and a
           prosocial orientation.

14

15  (Dkt. No. 4, at 93.)

16         The psychological report for petitioner's 1998 suitability hearing stated, in

17  relevant part,

18         Inmate Crapo has matured and changed considerably in his 13
           years of incarceration.  Although he maintains that he had no part
19         in the actual shooting of the victim, he takes responsibility for
           covering up the crime which negatively impacted the lives of all
20         involved.  He appears to be trying very hard to make something out
           of his life, which is evident in his vocational endeavors and in his
21         overall positive programming.  He has a good social support
           system on the outside.  He possesses the qualities of someone who
22         can be successful in life and who can be a contributing member of
           society.  In Dr. Nelson's 1997 evaluation of Mr. Crapo, he said,
23         "Inmate is at the point where he might reasonably be considered
           for parole within the next year."

24
           Inmate Crapo's diagnosis of Alcohol Dependence is indirectly
25         related to the committing offense.  When released to the
           community, violence potential is considered to be less than the
26         average inmate.

18

1    RECOMMENDATION: Since Mr. Crapo is psychologically stable,
     he should be removed from the psychological calender.  He is an
2    excellent candidate for parole.

3  (Dkt. No. 4, at 87.)

4            Neither the 2004, 2003, 2000, nor 1998 psychological reports stated that petitioner

5  required additional therapy to learn how to deal with stress before being released on parole.  In

6  fact, the 2003 report stated that petitioner's stress reduction strategy worked well for him in the

7  difficult prison environment.  The 2003 and 2000 reports also stated that petitioner would be a

8  low risk of danger if released on parole.  Based on the positive psychological reports quoted from

9  above, the undersigned does not find any evidence supporting the BPH's conclusion that

10 petitioner required additional therapy to deal with stress.

11           The undersigned further notes that the "stress therapy" ordered by the BPH was

12 not available.  As discussed in the 2003 psychological report, it was not available at the Deuel

13 Vocational Institution where petitioner was housed at the time of the 2003 suitability hearing.  At

14 the time of the 2006 suitability hearing, petitioner had been housed at the Correctional Training

15 Facility ("CTF") since 2004.  At the 2006 hearing petitioner stated that other than AA, there were

16 no other self-help programs available at CTF.  (Id., at 48.)  Because there was no evidence

17 supporting the BPH's finding that petitioner required additional "stress therapy," the undersigned

18 need not reach the issue of whether the BPH violated petitioner's right to due process by

19 requiring that he participate in unavailable therapy before being found suitable for parole.[2]

20           The BPH also found that petitioner required additional therapy to gain further

21 insight into the crime.  (Dkt. No. 4, at 59.)  However, the BPH did not describe how it found

22 petitioner's insight lacking.

23           As will be discussed below, petitioner always denied shooting the victim.

24 However, at the 2006 suitability hearing, petitioner's lawyer stated that petitioner would not

25

26     [2]  Although the BPH recommended that petitioner continue attending AA, petitioner was
     not found unsuitable on grounds that he required additional treatment for alcoholism.

answer questions regarding the facts of the case.   (Dkt. No. 4, at 17.)  Although petitioner did

not discuss the facts of the case, after reviewing the transcript the undersigned does not find that

petitioner's level of insight into the crime was inadequate, to the extent it was discussed.  For

these reasons, the undersigned can only conclude that in 2006 the BPH determined that petitioner

lacked insight into his offense because he continued to deny shooting the victim.   Accordingly,

the undersigned considers whether this finding, i.e. that petitioner required therapy in order to

gain further insight into the offense, was supported by the record.

      In all of the psychological reports prepared for petitioner's suitability hearings that

discussed the commitment offense, he denied shooting the victim.  (Dkt. No. 4, at 64, 67, 70, 78,

83, 86, 95-96, 100.)  However, petitioner became more honest about his involvement as time

went on.

      Petitioner did not discuss the offense during the 1988 psychological evaluation

because his appeal was pending.  (Dkt. No. 4, at 64.)  The psychological report prepared for the

1991 psychological hearing stated that petitioner's appeal was denied and he continued to

maintain his innocence.  (Dkt. No. 4, at 67.)  Petitioner's version of events, described in the 1991

psychological report, was that after he, Sanders and Price left Ball's trailer, they stopped along

the road for Sanders to relieve himself.  (Id.)  Petitioner stayed in the car and fell asleep.  (Id.)

He was later awakened by Sanders who told him that he and Price had had an argument.  (Id.)

Sanders and petitioner then returned to town.  (Id.)

      The 1992 psychological report stated that petitioner maintained his innocence.

(Id., at 70.)  The 1994 psychological report stated that petitioner maintained he was not the

shooter and that he did not plan the murder.  (Id., at 74.)  The 1994 report stated that petitioner

admitted that he was guilty of trying to cover up the murder.  (Id.)  The 1996 report stated that

petitioner stated that while he did not shoot the victim, he was guilty of covering up the murder.

(Id., at 78.)   The 1996 went on to state,

      The Subject maintains he was seated behind the steering wheel of a parked car.

1   His crime partner and the victim walked away.  He did not otherwise participate in
    the instant offense.  The accomplice returned to the car, woke up the Subject who
2   had fallen asleep, and that is all the Subject remembers.  The Subject has
    maintained this level of participation in the instant offense.   The record shows the
3   Subject's accomplice and the Subject giving their own versions of what happened
    and, not surprising, *pointing fingers at each other*.
4

5   (Dkt. No. 4, at 79 (emphasis in original).)

6          The 1997 report stated that in his first years of imprisonment, petitioner covered

7   up his involvement in the crime, although he admitted being involved in the offense.  (Dkt. No.

8   4, at 83.)  "He states that he is guilty about covering up the murder although he still denies

9   shooting the victim."  (Id.)  The 1997 psychological report stated that petitioner was at the point

10  where he might reasonably be considered for parole within the next year.  (Id., at 84.)

11         The 1998 psychological report described petitioner's version of events which is

12  very similar to the version contained in the 1996 psychological report.  The 1998 report also

13  stated that after Sanders returned to the car, he told petitioner that he and the victim had been

14  horsing around and his gun went off, shooting the victim.  (Id., at 86.)  Sanders asked petitioner

15  what they should do, and petitioner responded that he had had enough of the guy so they should

16  leave him.  (Id.)  Petitioner stated that he realized that if he had not covered up the crime, the

17  victim might not be dead and he might not be in prison.  (Id.)  Petitioner accepted responsibility

18  for leaving the scene of the crime and ignoring the victim's plight.  (Id.)  Petitioner also stated

19  that he had no idea that the shooting was going to take place.  (Id.)

20         The 2000 psychological report did not discuss the circumstances of the crime.

21  The 2003 psychological report contains a similar description of the offense by petitioner as is

22  contained in the 1996, 1997 and 1998 psychological reports.  (Dkt. No. 4, at 95-96.)  In other

23  words, petitioner denied shooting the victim, stated that Sanders accidentally shot the victim, but

24  admitted that he (petitioner) was guilty of covering up the offense and leaving the victim to die.

25  (Id.)  Finally, the 2004 psychological report stated that petitioner denied shooting the victim.

26  (Id., at 100.)

1    In finding petitioner unsuitable for parole because he lacked insight into the crime,

2  the BPH, in essence, found petitioner unsuitable because he denied being the shooter.  The BPH

3  is precluded from conditioning a prisoner's parole on admission of guilt.  Cal. Penal Code §

4  5011(b).  However, California courts have held that the BPH may consider a lack of insight as a

5  factor weighing against parole without violating § 5011 if the prisoner's version of events is

6  "physically impossible [or] strain[s] credulity such that his denial of an intentional killing [is]

7  delusional, dishonest, or irrational."  See In re Palermo, 171 Cal.App.4th 1096, 1112, 90

8  Cal.Rptr.3d 101 (2009) (citing In re Shaputis, 44 Cal.4th 1241, 82 Cal.Rptr.3d 213 (2008); and In

9  re McClendon, 113 Cal.App. 4th 315, 6 Cal.Rptr.3d 278 (2003)).

10    As discussed above, petitioner claimed that Sanders accidentally shot the victim

11  while petitioner was waiting in the car.  Petitioner claimed that the shooting was not planned.

12  Petitioner's version of events was not physically impossible.  Both he and Sanders had

13  previously discussed killing the victim, and petitioner was convicted largely on Sanders' claim

14  that petitioner shot the victim.  Petitioner's version of events, although weak, did not "strain

15  credulity."  This is not to say that the evidence did not demonstrate beyond a reasonable doubt

16  that petitioner shot the victim.  Rather, petitioner's version of events was not entirely impossible.

17    When a prisoner acknowledges his involvement in the commitment offense, but

18  attempts to minimize his role, the BPH may properly rely on lack of remorse or lack of insight in

19  making parole decisions.  In re Lazor, 172 Cal.App.4th 1185, 1202, 92 Cal.Rptr.3d 36 (2009)

20  ("An inmate's lack of insight into, or minimizing of responsibility for, previous criminality,

21  despite professing some responsibility, is a relevant consideration"); In re Elkins, 144

22  Cal.App.4th 475, 494, 8 Cal.Rptr.3d 82 (2006) ("Elkins had admitted his guilt of these crimes

23  decades earlier. Thus, the Governor relied not on a lack of guilt admission, but on Elkins having

24  delayed coming forward with all circumstances of what he admitted."); In re Rozzo, 172

25  Cal.App.4th 40, 62, n.9, 91 Cal.Rptr.3d 85 (2009) ("While it is improper to rely on a prisoner's

26  refusal to address the circumstances of the commitment offense in denying parole, evidence that

1  demonstrates a prisoner's insight, or lack thereof, into the reasons for his commission of the

2  commitment offense is relevant to a determination of the prisoner's suitability for parole.").

3         In the instant case, petitioner's version of events does not minimize his

4  involvement.  Petitioner does not, for example, claim that he shot the victim in self-defense when

5  the evidence demonstrated that he shot him in the back of the head at close range.  Rather,

6  petitioner denies shooting the victim, but admits culpable involvement.  The BPH improperly

7  required petitioner to admit guilt at the 2006 hearing.

8         The transcript from the 2006 suitability hearing demonstrates that petitioner had

9  insight regarding his involvement in the version of the offense he had consistently maintained for

10  years.  None of the recent psychological reports stated that petitioner required additional therapy

11  in order to gain further insight into the commitment offense.  For these reasons, the undersigned

12  finds that the BPH improperly found petitioner unsuitable on grounds that he required additional

13  therapy in order to gain insight into his offense.[3]

14         The only factors relied on by the BPH to find petitioner unsuitable that were

15  supported by the record were the circumstances of the commitment offense.  As discussed above,

16  at the time of the 2006 suitability hearing petitioner had been in prison for twenty-one years of

17  his fifteen years to life sentence.  The 2006 suitability hearing was his seventh suitability hearing.

18  As of 2006, petitioner had consistently received positive psychological reports for many years.

19  He had consistently engaged in all available self-help and educational programs.  (Dkt. No. 4, at

20  99.)  He had received laudatory chronos from his supervisors in the Prison Industries Woodshop.

21  (Id.)  He upgraded vocationally, becoming a journeyman cabinet maker.  (Id., at 98.)  He had

22  realistic parole plans.  (Id., at 99-100.)

23         Based on petitioner's positive prison programming, at the time of petitioner's

24  _____

         [3]  The therapy ordered by the BPH was apparently unavailable to petitioner.  However,

25  because the record does not support the BPH's finding that petitioner required this therapy, the

   undersigned need not address whether the BPH violated petitioner's due process rights by finding

26  him unsuitable for failing to participate in unavailable therapy.

2006 suitability hearing, the circumstances of his commitment offense no longer realistically

constituted a reliable or accurate indicator of his current dangerousness.   Rather, there was

affirmative evidence, based upon the petitioner's behavior while in prison and current mental

state that, if released, he would not currently be dangerous.  Accordingly, after conducting an

AEDPA review, the undersigned does not find that there was "some evidence" supporting the

BPH's 2006 decision that petitioner was still dangerous.  The application for writ of habeas

corpus should be granted.

    Accordingly, IT IS HEREBY RECOMMENDED that:

    1.  Petitioner's application for a writ of habeas corpus be granted;

    2.  The California Board of Parole Hearings be directed to set a parole date for

petitioner within thirty days of the date of the adoption of these findings and recommendations

    These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

one days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

objections shall be filed and served within fourteen days after service of the objections.  The

parties are advised that failure to file objections within the specified time may waive the right to

appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:   October 7, 2010

              _____

              KENDALL J. NEWMAN

              UNITED STATES MAGISTRATE JUDGE

crapo.hab